Filed 6/18/24  P. v. Martin CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>LUCIEN MARTIN,<br><br>        Defendant and Appellant. | B327394<br><br>(Los Angeles County<br>Super. Ct. No. KA005658) |

APPEAL from a postjudgment order of the Superior Court of Los Angeles County.  Mike Camacho, Judge.  Affirmed.

Nancy L. Tetreault, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill and Stephanie A. Miyoshi, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Lucien Martin appeals the denial of his petition for resentencing under Penal Code[1] section 1172.6 (former § 1170.95[2]) following an evidentiary hearing.  Appellant contends there is insufficient evidence to support the superior court's conclusion that appellant acted with reckless indifference to human life.  We disagree.  The record of appellant's trial contains substantial evidence to support the superior court's analysis under *Banks* and *Clark*[3] that appellant acted with reckless indifference to human life; he is therefore ineligible for relief under section 1172.6.  In light of this conclusion, we do not reach appellant's further contention that the superior court committed reversible error by suggesting that appellant could also be liable for first degree murder as a member of an uncharged conspiracy to commit a series of robberies, the natural and probable consequence of which was murder.

### FACTUAL AND PROCEDURAL BACKGROUND[4]

#### A. *The robberies and murder*

In the early morning hours of July 17, 1990, appellant and his cousin, Paul Watkins, engaged in a string of armed robberies

[1] Undesignated statutory references are to the Penal Code.

[2] Effective June 30, 2022, Penal Code section 1170.95 was renumbered section 1172.6, with no change in text.  (Stats. 2022, ch. 58, § 10.)

[3] *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*); *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*).

[4] The following factual summary is based on the clerk's and reporter's transcripts from appellant's trial, which were lodged with this court in connection with respondent's request for judicial notice of the records in *People v. Lucien Martin*, Second Appellate District No. B069142.

during which one of the victims was shot and killed. Appellant supplied the large nine-millimeter semiautomatic pistol with a magazine containing over 17 live rounds, which Watkins wielded in each of the robberies.

Around 3:30 a.m., appellant and Watkins approached Anthony Orosco and Juan Gallegos, who were sitting in Orosco's black Nissan pickup truck in the parking lot of an AM-PM Mini-Mart in Riverside. Watkins went to the driver's side and told Orosco to "get the fuck out of the truck." When Orosco turned his head, Watkins struck him on the temple with the gun. Leaving the keys in the ignition, Orosco exited the truck as Watkins continued to point his gun at him. Watkins then told Orosco to "get the hell out of here."

In the meantime, appellant went to the passenger side of the truck where Gallegos was seated. After Gallegos exited the vehicle, appellant took Gallegos's wallet and a gold chain with an engraved heart. Orosco and Gallegos then watched as Watkins jumped into the truck bed and appellant got into the driver's seat and drove away. Appellant stopped at a gas station to allow Watkins to get into the passenger seat in the cab before continuing on the freeway to the next robbery.

Shortly before 5:00 a.m., appellant pulled the truck into a Greyhound bus station in Claremont where Jihad Muhammed was standing alone waiting for a bus. Appellant stopped next to Muhammed. Without exiting the vehicle, Watkins pulled out the gun, pointed it at Muhammed, and demanded his money. Muhammed threw about $12 in cash into the truck, and appellant drove away.

Appellant then drove to a Holiday Inn in West Covina where he and Watkins had decided to commit another robbery.

3

As they pulled into the driveway sometime after 5:00 a.m., they saw Raymond Shield and his family in front of the hotel unloading luggage from a car to the sidewalk. Appellant parked the truck nearby and popped the hood. As he and Watkins quickly hopped out, Watkins tucked the gun into his waistband. They hurried to the front of the truck, opened the hood, and looked inside as if they were having engine trouble.

Watkins waved at Shield, who nodded and smiled. Shield walked over to the truck and offered to help. He stood with appellant and Watkins for about a minute as he appeared to look at the engine. Shield then hurried away from the truck toward his family. Fearing that Shield was going to call the police, appellant and Watkins immediately put the hood down and rushed to the cab of the truck. Appellant returned to the driver's seat as Watkins got in on the passenger side. The passenger door remained open. Before pulling both legs into the truck, Watkins took the gun from his waistband and fired a single fatal gunshot at Shield, who was about four or five steps away from the truck. Shield fell to the ground, and the truck sped away, tires screeching, with appellant at the wheel. The passenger door closed as the truck was accelerating.

After fleeing the scene of the murder, appellant drove to Gardena, a 35-minute drive from West Covina. There, they decided to commit another robbery. Appellant entered Steve's Market around 8:45 a.m., approached the counter, and asked Kyung Lee, the store's owner, for a pack of cigarettes. Lee told appellant they cost $1.95 and put a pack on the counter. Saying he needed to get another dollar, appellant walked out to a truck parked in front of the store. Lee watched appellant speak to Watkins in the truck, and then saw Watkins load a magazine

4

into a gun.  Lee hid behind a counter as appellant and Watkins returned to the market.  Appellant took money from the cash register and picked up the cigarettes while Watkins stood at the store entrance pointing his gun toward the register.  Lee then pulled out his own handgun and fired.  Watkins dropped the gun's magazine on the floor before appellant and Watkins fled in opposite directions.

## B. *Appellant's conviction*

Appellant was convicted by jury in 1992 of the first degree murder (§ 187, subd. (a), count 1) and attempted robbery (§§ 664/211, count 2) of Shield, the second degree robbery of Muhammed (§ 211; count 3), the second degree robbery of Lee (§ 211; count 4), and the second degree robberies of Orosco (§ 211; count 5) and Gallegos (§ 211; count 6).  The jury found that the murder occurred during the commission of an attempted robbery. (§ 190.2, subd. (a)(17).)  As to all counts, the jury found true the allegation that a principal was armed with a firearm in the commission of the crime.  (§ 12022, subd. (a)(1)).  The trial court sentenced appellant to state prison for a term of life without the possibility of parole plus one year for the murder, to be served consecutively with the determinate term of nine years eight months on counts 3, 4, 5, and 6.

This court affirmed the judgment in appellant's direct appeal.

## C. *The section 1172.6 evidentiary hearing and the superior court's findings*

Appellant filed a petition for resentencing pursuant to section 1172.6.  The superior court found a prima facie case for relief had been made, issued an order to show cause, and held an evidentiary hearing in accordance with section 1172.6,

5

subdivision (d).  At the hearing, the superior court noted that the prosecution had the burden of proving beyond a reasonable doubt that appellant could be convicted of murder on a theory that remains valid under current law.  It further recognized its duty to sit as an independent trier of fact.  To that end, the court stated it had "spent substantial time reviewing the record in the case," and had "a good grasp of the facts" and the evidence.

The prosecution argued appellant is liable for murder under current law as a direct aider and abettor to the murder and also under a felony-murder theory as a major participant in the attempted robbery of Shield who acted with reckless indifference to human life.  When the defense argued, the court asked counsel to focus on why appellant should not be found liable under a felony-murder theory as a major participant who acted with reckless indifference to human life pursuant to *Banks* and *Clark*.  The defense conceded that appellant was a major participant in the attempted robbery of Shield as well as the other robberies, but asserted there was no evidence appellant acted with reckless indifference to human life:  Appellant did not encourage Watkins to shoot or otherwise actively participate in the murder; given Watkins's nonviolent conduct during the previous robberies, appellant could not have anticipated that Watkins would shoot anyone when the men attempted to rob Shield; and "the only thing [appellant] did . . . was leave the scene, get in the driver's seat, and drive away" with his cousin in the car.

The superior court denied the petition.  It rejected the People's argument that appellant could be convicted of the murder under a theory of direct aiding and abetting, but analyzing the evidence under *Banks* and *Clark*, the court found

6

appellant guilty of felony murder under current law. In so ruling, the court emphasized appellant's role in supplying the weapon used to kill Shield, Watkins's use of this very large, loaded gun to threaten the victims in each of the robberies, appellant's failure to do anything in the aftermath of the shooting but help Watkins to escape, and appellant's commission of yet another robbery using the same loaded firearm immediately after the murder. On the strength of this evidence, the court declared, "[A]pplying the *Banks* and *Clark* analysis, it was clear[ ] that [appellant] was a major participant, [and] acted with reckless indifference to human life." Finding appellant ineligible for relief under section 1172.6, the superior court denied appellant's petition for resentencing.

## DISCUSSION

I. **Substantial Evidence Supports the Superior Court's Finding that Appellant Acted with Reckless Indifference to Human Life as a Major Participant in the Attempted Robbery of Shield**

A. *Applicable legal principles*

Effective January 1, 2019, Senate Bill No. 1437 was enacted by the Legislature " 'to amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' (Stats. 2018, ch. 1015, § 1, subd. (f).) In addition to substantively amending sections 188 and 189 of the Penal Code, Senate Bill [No.] 1437 added section [1172.6], which provides a procedure for convicted murderers who could not be convicted under the law as amended

7

to retroactively seek relief." (*People v. Lewis* (2021) 11 Cal.5th 952, 959.) Specifically with regard to felony-murder liability, Senate Bill No. 1437 amended section 189, subdivision (e) to add the requirement that a defendant who was not the actual killer or a direct aider and abettor with the intent to kill must have been a major participant in the underlying felony who acted with reckless indifference to human life. (*People v. Strong* (2022) 13 Cal.5th 698, 707–708.)

Once a defendant convicted of murder under the old law has filed a facially sufficient resentencing petition under section 1172.6, the superior court must determine whether the petitioner has made a prima facie showing of eligibility for relief, and, if so, issue an order to show cause. (§ 1172.6, subd. (c); *People v. Wilson* (2023) 14 Cal.5th 839, 869 (*Wilson*); *People v. Nieber* (2022) 82 Cal.App.5th 458, 469–470 (*Nieber*).)

The superior court then conducts an evidentiary hearing to determine whether the petitioner is entitled to relief. (§ 1172.6, subd. (d)(1).) At that hearing, the superior court sits as the trier of fact, and the burden of proof rests with the prosecution " 'to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder' under the law as amended by Senate Bill [No.] 1437 (§ 1172.6, subd. (d)(3))." (*Wilson, supra*, 14 Cal.5th at p. 869.) "[T]he court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed." (§ 1172.6, subd. (d)(3).) "In addition to evidence admitted in the petitioner's prior trial, both '[t]he prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens.' ([§ 1172.6, subd. (d)(3)].) 'If the prosecution fails to sustain its burden of

8

proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges.' (*Ibid.*)" (*Wilson*, at p. 869; *People v. Hill* (2024) 100 Cal.App.5th 1055, 1065–1066 (*Hill*).)

**B. *Substantial evidence supports the superior court's finding that appellant acted with reckless indifference to human life***

Appellant does not challenge the superior court's finding that he was a major participant in the attempted robbery of Shield and the other robberies, but asserts there is no substantial evidence that he acted with reckless indifference to human life within the meaning of the Supreme Court's decisions in *Banks, supra,* 61 Cal.4th 788, and *Clark, supra,* 63 Cal.4th 522. We disagree.

"On appeal from the denial of a section 1172.6 petition after an evidentiary hearing, we review the superior court's factual findings for substantial evidence and the court's application of the law to those facts de novo. (*People v. Wilson* (2023) 90 Cal.App.5th 903, 916.) In conducting our review, we consider the whole record in the light most favorable to the superior court's findings (*People v. Rivera* (2019) 7 Cal.5th 306, 323), and we presume ' " 'every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence.' " ' (*Id.* at p. 331.)" (*Hill, supra,* 100 Cal.App.5th at p. 1066.) Our task is to determine "whether substantial evidence, defined as reasonable and credible evidence of solid value, has been disclosed, permitting the trier of fact to find guilt beyond a reasonable doubt." (*People v. Vargas* (2020) 9 Cal.5th 793, 820.)

"'Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence.'" (*People v. Brooks* (2017) 3 Cal.5th 1, 57.)  Reviewing the whole record, we must "determine whether *any* rational trier of fact could have found the essential elements of the crime . . . beyond a reasonable doubt." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357; *People v. Montanez* (2023) 91 Cal.App.5th 245, 270.)  And "whether the prosecutor relied upon direct or circumstantial evidence, if the trier of fact's determination is supported, reversal is not warranted, even where ' " 'the circumstances might also reasonably be reconciled with a contrary finding.' " ' " (*Hill, supra,* 100 Cal.App.5th at p. 1066.)

In *Banks*, our Supreme Court identified several factors to be considered when a court must determine whether a defendant was a major participant " 'in criminal activities known to carry a grave risk of death.' " (*Banks, supra,* 61 Cal.4th at p. 803.)  A year after *Banks*, the high court handed down another list of factors to consider in determining whether a defendant acted with reckless disregard for human life. (*Clark, supra,* 63 Cal.4th at pp. 618–623.)  Our Supreme Court has described the mental state of reckless indifference to human life as " 'knowingly engaging in criminal activities known to carry a grave risk of death.' " (*In re Scoggins* (2020) 9 Cal.5th 667, 676 (*Scoggins*), quoting *Tison v. Arizona* (1987) 481 U.S. 137, 157 [107 S.Ct. 1676, 95 L.Ed.2d 127].)  This mental state " 'encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions.' " (*Scoggins*, at pp. 676–677, quoting *Clark,* at p. 617.)

The court explained that "[r]eckless indifference to human life has a subjective and an objective element. (*Clark, supra*, 63 Cal.4th at p. 617.) As to the subjective element, '[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create.' (*Banks, supra*, 61 Cal.4th at p. 801; see *Clark*, at p. 617.) As to the objective element, ' "[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation." ' (*Clark*, at p. 617, quoting Model Pen. Code, § 2.02, subd. (2)(c).)" (*Scoggins, supra,* 9 Cal.5th at p. 677.)

The relevant factors to consider in determining reckless indifference to human life (which overlap significantly with the major participant factors identified in *Banks*) include: "(1) The defendant's use of, or awareness of the presence of a weapon or weapons; (2) The defendant's physical presence at the crime, and the opportunities to limit it and/or to aid the victim(s); (3) The duration of the felony and restraint of the victim(s); (4) The defendant's awareness that an associate is likely to kill; and (5) The defendant's efforts to minimize the risk of violence during the course of the felony." (*Hill, supra,* 100 Cal.App.5th at pp. 1074–1075; *Clark, supra,* 63 Cal.4th at pp. 618–623.) In both *Banks* and *Clark*, our Supreme Court emphasized that " '[n]o one of these considerations is necessary, nor is any one of them necessarily sufficient.' " (*Clark*, at p. 618, quoting *Banks*, *supra*, 61 Cal.4th at p. 803.) Rather, what matters is the totality of the circumstances. (*Scoggins, supra,* 9 Cal.5th at p. 677.)

Based on the totality of the circumstances and applying the *Clark* factors to the case at bar, we conclude that substantial evidence supports the superior court's finding that appellant acted with reckless indifference to human life as a major participant in the attempted robbery of Shield.

*Appellant's use of or awareness of the presence of a weapon.*

Appellant was obviously aware of the presence of the weapon and knew that it would be used. Indeed, as the superior court found, appellant set the whole criminal enterprise in motion by supplying the weapon that was used in all four of the robberies as well as the attempted robbery which resulted in Shield's murder. The weapon was a big "scary" gun that "looked like an Uzi." It had a magazine containing at least 17 live rounds, and the court reasonably inferred that appellant knew the gun was loaded. Both men handled the gun prior to the murder, passing it back and forth between them. There was no evidence appellant and his cousin even contemplated committing this string of robberies before appellant came up with a "proper gun" they could use to "jack some people." But as soon as Watkins suggested committing the robberies, appellant agreed.

*Appellant's physical presence at the crime, and opportunities to limit its scope, minimize the risk of violence, and/or aid the victim.*

Appellant was physically present and actively facilitated the entire string of robberies leading up to and continuing after the fatal shooting. He personally robbed Gallegos while Watkins held the victims at gunpoint, struck Orosco in the face with the gun, and forced the victims out of their truck. Despite Watkins's aggressive use of the gun during the first robbery, appellant facilitated the hunt for the next victim, driving the stolen truck

from Riverside to Claremont where he and Watkins committed another robbery using the gun. After that robbery, appellant drove on to West Covina with Watkins in the passenger seat holding the gun in his lap.

Intent on committing another robbery, appellant pulled into the driveway of the Holiday Inn and parked the truck near the Shield family. Appellant popped the hood, and as he and Watkins quickly exited the truck, Watkins tucked the gun into his waistband. They both hurried to the front of the truck and opened the hood to make it appear they had engine trouble. Watkins waved to Shield, drawing Shield over to the truck and away from his family. As soon as Shield began to walk hurriedly back toward his family, appellant and Watkins closed the hood and rushed to get back into the truck, fearing that Shield was going to call the police. With the passenger door still open and one foot hanging outside the vehicle, Watkins fired the gun at Shield, who was only about four or five steps away. The truck then immediately took off, tires screeching, with appellant at the wheel. The passenger door closed as the truck started to peel away.

In light of appellant's presence and active participation in the robberies of Orosco, Gallegos, and Muhammed, his presence and conduct during the attempted robbery and killing of Shield was particularly suggestive of his mental state. Indeed, as our Supreme Court in *Clark* observed, "Proximity to the murder and the events leading up to it may be particularly significant where . . . the murder is a culmination or a foreseeable result of several intermediate steps." (*Clark*, *supra,* 63 Cal.4th at p. 619; *People v. Mitchell* (2022) 81 Cal.App.5th 575, 592 (*Mitchell*) [the fact that defendant "was physically present at every stage of the crime:

13

planning, execution, dividing the spoils, and flight" supported finding of reckless indifference].)

Even more revealing of appellant's reckless indifference to human life was his conduct following the homicide. After the failed robbery and killing of Shield, appellant drove Watkins to Gardena, a 35-minute drive from the Holiday Inn in West Covina. Upon reaching a safe distance from the scene of the killing, appellant and Watkins decided to commit another robbery using the same weapon, and drove to Steve's Market. Appellant went inside and asked for a pack of cigarettes. On the pretense of going to get more money to pay for the cigarettes, appellant returned to the truck where Watkins was waiting. After inserting a magazine into the gun, the two men walked to the store together, whereupon Watkins stood at the door pointing the gun as appellant broke into the cash register.

Stressing "the importance of presence to culpability," our Supreme Court has observed that a defendant who is present has " 'an opportunity to act as a restraining influence on murderous cohorts. If the defendant fails to act as a restraining influence, then the defendant is arguably more at fault for the resulting murders.' " (*Clark, supra*, 63 Cal.4th at p. 619; *In re Loza* (2017) 10 Cal.App.5th 38, 53–54 (*Loza*).) Here, despite many opportunities to do so, appellant did nothing to minimize the potential for violence or limit the scope of the crime spree, even after Watkins had used violence during the first robbery and then shot and killed Shield. Instead, after participating in the ruse that lured Shield to the truck, and knowing that his cousin had shot the man at close range, appellant rendered no aid, but drove Watkins away from the scene as fast as possible. After reaching

14

a place of safety, he fully participated with Watkins in yet another robbery using the same weapon.

Appellant's conduct easily satisfies the *Clark* standard for demonstrating reckless indifference to human life. (*Clark, supra,* 63 Cal.4th at p. 619 [United States Supreme Court and "[o]ther appellate courts have considered relevant a defendant's failure to provide aid while present at the scene" in finding reckless indifference to human life]; see also *Nieber, supra,* 82 Cal.App.5th at p. 479 [defendant's failure to render aid supported finding of reckless indifference]; *People v. Bradley* (2021) 65 Cal.App.5th 1022, 1034–1035 [immediate flight after shooting without rendering aid supports finding of reckless indifference]; *In re Parrish* (2020) 58 Cal.App.5th 539, 544 (*Parrish*) [petitioner "took no steps to reduce risks or to alleviate harm," nor did he so much as pause "to aid or comfort the victim"]; *Loza, supra,* 10 Cal.App.5th at p. 53 ["As with petitioner's role as a major participant, we find particularly significant in concluding that petitioner acted with reckless indifference his physical presence at the scene and his failure to make any attempt to prevent the shootings or to assist the victims"].)

*The duration of the crime.*

Given that Shield was shot out of fear that he was going to call the police, the brief duration of the attempted-robbery-turned-murder does not weigh in appellant's favor. (See *Parrish, supra,* 58 Cal.App.5th at p. 544 ["the brevity of the robbery and the speed of the murder arose because Parrish told the gunmen a witness was calling the police, at which point one gunman shot a witness. The rapidity of this sequence does not make Parrish less blameworthy"]; *Mitchell, supra,* 81 Cal.App.5th at p. 594 [duration of the crime was brief, not because the defendant

showed compassion or regard for the victim, but because the frightened victim tried to flee].)

Moreover, the attempted robbery that led to Shield's death was not a quick one-off event, but one of many crimes committed over a five and a half-hour period. Appellant had ample time during the drive from one robbery to the next to reason with Watkins and seek to minimize violence. Instead, even after fleeing the Shield murder, appellant drove to Steve's Market and again participated in a potentially lethal robbery.

*Appellant's awareness of Watkins's propensity for violence*

Appellant argues there is no evidence he could have known his cousin would use lethal force in committing any of the robberies. He further suggests his expression of surprise after the shooting shows he had not anticipated Watkins would fire the gun. To the contrary, appellant became aware during the very first robbery that Watkins was willing to do more than just brandish the weapon when he struck Orosco in the face with the gun. And as set forth above, appellant's active participation in another robbery after the shooting demonstrated that appellant was aware of the potential for deadly violence and accepted that risk. Not only did appellant drive Watkins to Steve's Market after the Shield killing, but he knew that Watkins had just loaded the magazine into the gun and went on with the robbery anyway. (See *Mitchell, supra,* 81 Cal.App.5th at pp. 593–594 [defendant did nothing to distance himself from his brother's violent actions, but instead continued to help rob the victim]; see also *Loza, supra,* 10 Cal.App.5th at p. 55 ["petitioner's participation in and presence during the armed robbery exhibited a reckless indifference to human life, notwithstanding any surprise he may have exhibited after the fact"].)

16

*The defendant's efforts to minimize the risk of violence*

It bears repeating that appellant did nothing to minimize the risk of violence during this string of armed robberies. Quite the opposite: Appellant procured the loaded weapon used in the robberies, appellant actively participated in every one of the robberies, appellant joined in the deception which drew Shield to the truck to facilitate robbing him, and appellant enabled Watkins to escape after Watkins shot Shield. Then appellant facilitated another robbery which presented an even greater likelihood of lethal violence.

*The totality of the circumstances support the superior court's finding of reckless indifference*

The subjective component of reckless indifference to human life is a mental state which is rarely subject to proof by direct evidence. In assessing the sufficiency of the evidence supporting the superior court's conclusion that appellant acted with reckless indifference to human life, we accept, as we must, the logical inferences the court as trier of fact drew from the circumstantial evidence presented at appellant's trial. (*People v. Combs* (2004) 34 Cal.4th 821, 849 ["An appellate court must accept logical inferences that the [trier of fact] might have drawn from the evidence even if the [reviewing] court would have concluded otherwise"].) We therefore conclude that substantial evidence supports the superior court's finding that appellant acted with reckless indifference to human life as a major participant in the attempted robbery that resulted in the death of the victim.

**C.** *The superior court's apparent failure to consider appellant's youth at the time of the offense does not require remand for a determination of the impact of youth-related factors on appellant's culpability for murder*

Since the Supreme Court's decisions in *Banks, Clark*, and *Scoggins*, appellate courts have considered whether and to what extent a defendant's relative youth—which various statutes refer to as being under the age of 26 (§§ 3051, subd. (a)(1), 4801, subd. (c))—is relevant to assessing whether a defendant has satisfied the subjective component of the reckless indifference test. These courts have reached the general consensus that the defendant's age at the time of the offense is an additional factor a court may consider in determining whether the defendant acted with reckless indifference to human life. (See, e.g., *People v. Harris* (2021) 60 Cal.App.5th 939, 960 (*Harris*); *In re Moore* (2021) 68 Cal.App.5th 434, 439 (*Moore*); *People v. Ramirez* (2021) 71 Cal.App.5th 970, 990 (*Ramirez*); *Mitchell*, *supra*, 81 Cal.App.5th at p. 595; *In re Harper* (2022) 76 Cal.App.5th 450, 468–470 (*Harper*); *People v. Keel* (2022) 84 Cal.App.5th 546, 558–559 (*Keel*); *People v. Jones* (2022) 86 Cal.App.5th 1076, 1091–1093 (*Jones*); *People v. Oliver* (2023) 90 Cal.App.5th 466, 488–489 (*Oliver*); *People v. Pittman* (2023) 96 Cal.App.5th 400, 416–418 (*Pittman*).)

Appellant was 18 years old when he committed the string of robberies that resulted in the murder in this case. Although appellant did not raise any issue regarding his youth at the time of the offenses during the evidentiary hearing in the superior court, he now argues that the court erred in failing to consider appellant's "cognitive development and the hallmark features of youth" in determining whether appellant acted with reckless

indifference to human life.  According to appellant, the error requires reversal and remand to permit the superior court to consider the impact of youth-related factors on appellant's culpability for murder.  In response, the Attorney General asserts appellant forfeited any claim regarding the consideration of his youth by failing to raise the issue in the superior court, but in any event, the court's failure to consider appellant's youth was harmless.

Appellant counters that it was not until after the evidentiary hearing in this case that the court in *Jones* definitively held that "[i]n addition to the *Banks* and *Clark* factors, a defendant's youthful age must be considered."  (*Jones, supra,* 86 Cal.App.5th at p. 1088, fn. 7.)  Because the law in this area was unsettled at the time of the hearing, appellant argues it is unlikely the court or the parties knew consideration of appellant's age and maturity level would become "a mandatory consideration."

To the contrary, the relevance of youth to the reckless indifference inquiry was well established by the time of the November 4, 2022 evidentiary hearing on appellant's section 1172.6 petition.  *Harris, supra,* 60 Cal.App.5th 939, the first case on this issue, was decided on February 16, 2021, nearly two years before the hearing in this case.  After *Harris* five other cases—all decided before November 2022—held that youth is a relevant factor in the reckless indifference analysis:  *Moore, supra,* 68 Cal.App.5th 434 (decided Aug. 31, 2021), *Ramirez, supra,* 71 Cal.App.5th 970 (decided Nov. 23, 2021), *Mitchell, supra,* 81 Cal.App.5th 575 (decided July 22, 2022), *Harper, supra,* 76 Cal.App.5th 450 (decided Mar. 17, 2022), and *Keel, supra,* 84 Cal.App.5th 546 (decided Oct. 21, 2022).

19

Thus, unlike *Jones*, where the evidentiary hearing was held less than a month after *Harris* and before any other cases addressed the issue, the hearing in this case occurred well after numerous courts had decided that the defendant's youth should be considered as part of the reckless indifference inquiry. In general, we presume the superior court knew and applied the relevant law in exercising its duties. (*In re Julian R.* (2009) 47 Cal.4th 487, 499 [" 'we apply the general rule "that a trial court is presumed to have been aware of and followed the applicable law" ' "].) But even if the superior court did not consider this factor in its reckless indifference analysis, we find any error harmless under *People v. Watson* (1956) 46 Cal.2d 818, 836. (*Oliver, supra*, 90 Cal.App.5th at p. 489, fn. 8 [applying *Watson* harmless error analysis]; *Pittman, supra,* 96 Cal.App.5th at pp. 417–418 [same].)

There is no evidence in the trial record that suggests appellant lacked the maturity to act with reckless indifference to human life. To the contrary, the evidence showed appellant to be a mature young man who was able to appreciate the risk his crime spree posed to human life. Appellant had gotten married in 1991 and had good and loving relationships with his wife and stepson. He had worked for his brother-in-law, assisting with painting, plumbing and carpentry in his brother-in-law's residential construction business, and his brother-in-law considered him to be a "[v]ery good worker." Appellant and his daughter also lived with the brother-in-law for about six months. The brother-in-law described appellant's relationship with his daughter as "[b]eautiful." He observed appellant to be a caring and involved father, "[b]athing the child, comb[ing] her hair," and "provid[ing] for her."

Significantly, appellant's conduct before, during and after the robberies and attempted robbery that resulted in the victim's death did not demonstrate an immaturity that would suggest he was not acting with reckless indifference to human life.  As the court in *Oliver* explained, "[T]he case law discussing the differences in brain development among youthful offenders (in contrast to their adult counterparts) stress two areas of divergence:  (1) their relative impulsivity; and (2) their vulnerability to peer pressure." (*Oliver, supra,* 90 Cal.App.5th at p. 489.)  Here, there is nothing to indicate appellant's participation in this crime spree was due to peer pressure, nor did the evidence suggest he behaved "like an immature, naïve, or impulsive adolescent." (*Harper, supra,* 76 Cal.App.5th at p. 472.)

Rather, appellant and his cousin planned and carried out a series of robberies using a loaded firearm supplied by appellant.  Not only was appellant an active participant in each of the robberies, he also took part in the ruse which drew Shield over to the truck, and then immediately drove Watkins away from the scene after the fatal shooting.  Following a 35-minute drive from West Covina to Gardena, appellant and Watkins assessed their gains from the robberies they had committed and realized they had not had much success.  After discussion they decided to commit one more robbery in hopes of coming out ahead for the night.

The evidence in this case thus shows appellant making a series of reasoned, if ill-advised, decisions to commit a string of robberies after discussion and planning with his cousin.  Appellant actively facilitated every stage of the crime spree.  There is simply no evidence to suggest appellant's participation in the attempted robbery which resulted in the victim's death

was the product of youthful impulsivity or an inability to assess the consequences of his actions.

While "[y]outh can distort risk calculations," we also recognize that "[t]he fact of youth cannot overwhelm all other factors." (*Mitchell, supra,* 81 Cal.App.5th at p. 595.) As set forth above, the consideration of appellant's youth in this case "is overborne here by the *Banks-Clark-Scoggins* factors that show [appellant's] indifference to his victim's life." (*Ibid.*) Accordingly, we conclude that any error in the superior court's failure to consider appellant's youth was harmless.

## DISPOSITION

The order denying appellant's petition for resentencing under Penal Code section 1172.6 is affirmed.

NOT TO BE PUBLISHED.

LUI, P. J.

We concur:

ASHMANN-GERST, J.

CHAVEZ, J.